FILED
IN CLERK'S OFFICE
DISTRICT COURT E D N Y
★ OCT 23 2015 ★
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

№ 14-CR-645 (JFB)

---

UNITED STATES OF AMERICA,

VERSUS

JUVENILE MALE,

Defendant.

---

**MEMORANDUM AND ORDER**
October 23, 2015

---

JOSEPH F. BIANCO, District Judge:

On December 17, 2014, the government filed a Juvenile Information ("Information") against defendant Juvenile Male ("defendant") charging him with one count of conspiracy to commit murder, 18 U.S.C. §§ 1959(a)(5) and 5032 *et seq.*; one count of murder, 18 U.S.C. §§ 1959(a)(1), 2 and 5032 *et seq.*; one count of discharge of a firearm during crimes of violence, 18 U.S.C. §§ 924(c)(1)(A)(i), 934(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 5032 *et seq.*; and one count of causing the death of another through the use of a firearm, 18 U.S.C. §§ 924(j)(1), 2 and 5032 *et seq.* The government subsequently moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On October 2, 2015, after written submissions had been filed with the Court, the Court conducted an evidentiary hearing on the government's transfer motion.[1] At the hearing, documentary evidence was received into evidence, and the Court heard the testimony of two defense witnesses – namely, the defendant's mother and a psychologist, Dr. Virginia Barber Rioja, M.P. ("Dr. Rioja"). Following the hearing, the defendant's counsel and the government submitted supplemental letters further outlining their respective positions on the motion. Having carefully considered the evidence and arguments, this Memorandum and Order contains the Court's findings pursuant to 18 U.S.C. § 5032.

---

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. 18 U.S.C. § 5038(e). The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Information should be sealed.

For the reasons set forth herein, the Court finds that transfer of this case to district court for prosecution of the defendant as an adult is warranted in the interest of justice. More specifically, as discussed in detail below, after conducting a hearing and carefully analyzing the statutory factors, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted.

Applying the statutory factors, it is clear that this is a compelling case for transfer to adult status. First, the nature of the alleged offense – the brutal, premeditated murder of an individual believed to be a member of a rival gang – overwhelmingly favors, in the interest of justice, transferring the case to district court so that the defendant can be prosecuted as an adult. Moreover, this murder is alleged to have been committed as part of the defendant's participation in the racketeering activity of the violent La Mara Salvatrucha ("MS-13") street gang. Thus, the Court finds that the nature of the alleged offense is entitled to special weight in this case. The juvenile justice system, including the limited sentencing options available in that system if defendant is found guilty (such as the statutory maximum of five years' incarceration), is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address these grave charges when considered in conjunction with the other statutory factors. Second, with respect to the statutory factor regarding the defendant's age and social background, defendant allegedly committed the offense when he was approximately 17 years and 10 months old, and he is now 20 years and 11 months old. Defendant lived in El Salvador until he was fourteen years old when he immigrated to the United States and moved in with his parents, whom he met for the first time upon his arrival. Defendant joined MS-13 after dropping out of school and being turned out of the house by his father, with whom he had a difficult relationship. Although defendant's background only slightly weighs in favor of transfer, both his current age and his age at the time of the commission of the offense strongly weigh in favor of transfer. Third, defendant's prior juvenile record, which consists only of an arrest for petit larceny when he was sixteen years old, weighs against the transfer; however, his conviction for illegally possessing a firearm several months after his eighteenth birthday and the alleged murder weighs in favor of transfer. The fourth factor, the defendant's present intellectual development and psychological maturity, weighs in favor of transfer of the defendant to adult status. Specifically, Dr. Rioja, the psychologist who examined the defendant for the defense, determined that he had no cognitive impairments or significant deficits and his intellectual functioning was estimated to be in the average range when compared with individuals his age; she also concluded that he had a moderate degree of cognitive maturity and no significant defects in emotional maturity. (Psychological Evaluation by Dr. N.G. Rioja, Aug. 4. 2015 ("Rioja Report") at 10-11.) Thus, this factor weighs in favor of transfer. Fifth, the factor regarding past treatment efforts is a neutral factor because there is no specific information in the record relating to the existence or nature of past treatment efforts. Finally, although the sixth factor weighs against transfer, given the apparent availability of out-of-state juvenile facilities with programs designed to treat defendant's behavioral problems, this factor does not outweigh the other factors. In particular, the serious and violent nature of the offense, coupled with his age at the time of the event, overwhelmingly favors transfer. In short,

2

after considering and weighing all of the statutory factors, as discussed in detail below, the Court has determined that the interest of justice would be served by treating the defendant as an adult in this case.

## I. THE CHARGES[2]

The charges against the defendant stem from his alleged involvement in MS-13, a criminal enterprise based in El Salvador and operating in Long Island, Queens, and elsewhere in the United States and Central America. (Gov't Mem. of Law at 2-4.) On Long Island, MS-13 is alleged to have engaged in street wars with rival gangs that have resulted in the murder, shooting, and assault of both MS-13 and rival gang members, as well as their families and innocent bystanders. (*Id.* at 3.)

As set forth in the government's transfer motion, defendant has been charged in connection with the murder of Jose Vallejo ("Vallejo"). According to the allegations in the government's submissions, the defendant was a member of the Hempstead Locotes Salvatruchas ("HLS") clique of the MS-13 but along with another member of the HLS clique, Mario Diaz, sought to become a member of the Sailors Locotes Salvatruchas ("Sailors") clique of the MS-13. (*Id.* at 5-6.) Defendant and Diaz agreed to murder Vallejo with other members of the Sailors clique to prove that they were willing to commit violence on behalf of the MS-13 and were worthy of becoming members of the Sailors clique. (*Id.* at 6.) Vallejo sold marijuana in Kennedy Park, which was considered by the MS-13 to be part of their territory, and was marked for death because he was believed to be associated with a rival gang, the 18th Street gang, and was selling drugs in an MS-13 controlled territory. (*Id.*)

On September 8, 2012, the defendant, Diaz, and two other members of the Sailors clique, Walter Lopez and Melvin Marquez-Sanchez, drove to Kennedy Park to murder Vallejo. (*Id.*) They contacted Vallejo with the purpose of luring him to the park under the guise of purchasing marijuana from him. (*Id.*). Once he arrived at the park, the defendant and the other MS-13 members attacked him. (*Id.* at 7.) Vallejo was shot multiple times with a .38 caliber handgun and stabbed numerous times, and the marijuana that he was holding was also taken. (*Id.*) The defendant slashed Vallejo in the neck with a machete. (*Id.*). In recognition of their participation in the murder, the defendant and Diaz were "jumped in" as members of the Sailors clique. (*Id.*)

The defendant was initially arrested by Nassau County police officers on May 14, 2013, and charged with firearm possession. On June 6, 2014, the defendant pled guilty to being an alien in illegal possession of a firearm, in violation of Title 18, § 922(g). (*Id.* at 9-10.) During his incarceration on that offense, on December 17, 2014, the initial charges in this case were brought against the defendant.

---

[2] The allegations set forth herein were drawn from the government's motion papers and supporting documentation, including the Juvenile Information. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offense as set forth by the government and takes no position as to the relative strength of the evidence supporting those allegations.

3

## II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032).[3] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588.

Given the presumption that exists in favor of juvenile adjudication, the burden is on the government to establish, by a preponderance of the evidence, that transfer is warranted. *See Nelson I*, 68 F.3d at 588; *United States v. John Doe #3*, 113 F. Supp. 2d 604, 605 (S.D.N.Y. 2000).

Although the Court must evaluate each of the six factors outlined in § 5032, it need not afford each of these factors equal weight, and instead "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder," which "certainly may be a factor entitled to special weight." *Id.* Furthermore, the defendant's potential for rehabilitation typically should also be given "special emphasis." *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002). Indeed, the notion of rehabilitation "permeat[es] the transfer decision . . . [and] clearly is one of the primary purposes of the juvenile delinquency provisions." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*") (internal quotation marks and citation omitted). Nevertheless, even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," this factor "must be balanced against the threat to society posed by juvenile crime." *Id.* (internal quotation marks and citations omitted). Accordingly, it is not sufficient for a court to find that there is merely a "glimmer of hope" for a juvenile's future treatment prospects. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a

---

[3] In addition, § 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the United States Attorney for the Eastern District of New York, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial Federal interest in the case and the offenses to warrant the exercise of Federal jurisdiction." (Juvenile Certification, Dec. 17, 2014, ECF No. 2.)

4

standard that "strikes the appropriate balance" between "affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*, 90 F.3d at 640 (citations and alterations omitted).[4]

### III. ANALYSIS OF FACTORS

#### A. Juvenile's Age and Social Background

The Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that district court erred in refusing to consider juvenile's age at the time of the transfer hearing and noting that "unless the government intentionally delays the filing of juvenile charges, there is every reason to give weight also to the age at the time of the transfer motion. The statutory factor specifies only 'age,' and certainly, current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application."). The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer. *See United States v. Juvenile Male*, 554 F.3d 456, 468-69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citation omitted)).

In this case, defendant was approximately 17 years and 10 months old at the time of the alleged murder, and 20 years and 11 months old at the time of the hearing. The defendant's age at the time of the crime weighs in favor of transfer. *See United States v. Doe*, 49 F.3d 859, 867 (2d Cir. 1995) (finding that district court did not abuse its discretion in concluding that age favored transfer where juvenile committed robbery at age 16 ½ and extortion at age 17, and explaining that "because Doe had continued to engage in acts involving [his gang] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion"); *United States v. C.P.A.*, 572 F. Supp. 2d 1122, 1126 (D.N.D. 2008) (defendant's age of 17 years 8 months at time of offense and age of 18 at the time of hearing favored transfer); *United States v. H.V.T.*, No. 96-cr-244, 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) ("H.V.T. was almost 18 years old at the time of the conduct with which he is charged. Thus, the

---

[4] Section 5032 of the Juvenile Justice and Delinquency Prevention Act also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male #1*, 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard outlined *supra*.

5

conduct did not occur when H.V.T. was very young, and age is a factor favoring transfer."); *see also United States v. A.R.*, 203 F.3d 955, 961 (6th Cir. 2000) (stating that several courts have concluded "that the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult"). Defendant's current age also weighs in favor of transfer. Insofar as rehabilitation is one of the primary focuses of a district court in determining whether to transfer a defendant to adult status, the Court finds that the defendant's current age of 20 years and 11 months, which would allow him only five years[5] in a juvenile detention facility to rehabilitate himself (if adjudicated guilty as a juvenile), weighs in favor of transfer. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *Juvenile Male*, 554 F.3d at 469 ("[W]e agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal

violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21.").

The Court finds that defendant's social background also weighs in favor of transfer. Defendant was born in El Salvador and moved to the United States when he was fourteen years old. (Rioja Report at 2-3.) His father left El Salvador before he was born and his mother left when he was one year old. (*Id.* at 2.) Defendant was primarily raised by his maternal grandparents, who he reported took good care of him, until he was thirteen years old, at which time, he and his older brother, Josue, moved in with their paternal grandparents because gangs were "harassing" Josue. (*Id.*) Approximately four to five months later, defendant reported that Josue suddenly departed for the United States, leaving him with his paternal grandparents. (*Id.* at 2-3.) By all accounts, defendant and Josue were very close, and the defendant reported his brother leaving as "the most difficult experience of [his] life." (*Id.* at 3.) Several months later, the defendant was also sent to the United States, where he met his parents for the first time that he could remember, as well as two sisters who were born in New York. (*Id.*) He reported getting along well with his sisters and that his mother "tried really hard to show him love" but that his father was "very distant" and cold towards him and Josue. (*Id.*)

The defendant enrolled in and completed ninth grade at Roosevelt High School. (*Id.*) However, he reported having problems with other students in the tenth grade because they believed him to be a gang member because he was Salvadorian, and he started to skip school. (*Id.* at 3-4.) The defendant ultimately dropped out of school, prompting

---

[5] *See* 18 U.S.C. § 5037(c)(2)(A)(i)-(ii) ("The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may not extend . . . in the case of a juvenile who is between eighteen and twenty-one years old (A) who if convicted as an adult would be convicted of a Class A, B, or C felony, beyond the lesser of (i) five years or (ii) the maximum of the guideline range . . . applicable to an otherwise similarly situated adult defendant . . . .")

6

his father to ask him to leave the house because he was not going to school and could not find a job. (*Id.* at 6.) During this time, defendant barely talked to his mother and moved in with a friend, who was a member of the MS-13. (*Id.*) Subsequently, defendant was "officially" made a member of MS-13, which made him feel like he was a part of a "new family." (*Id.*) When asked if he ever attempted to leave the gang, the defendant reported that he did try to withdraw, but it was "very difficult" and caused other members to "harass" him, and that about six months before his arrest, he had moved back into his parents' house and was spending more time with his family. (*Id.* at 7.)

The defendant has been attending school while incarcerated. (*Id.* at 14.) As to substance abuse, the defendant reported that he smoked marijuana "almost daily, 'every time some of [his] friends would pass it around'" and that he would drink beers socially on the weekends. (*Id.* at 4.)

The Court finds that defendant's background indicates that it is unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged as a juvenile. Dr. Rioja testified at the hearing that, defendant's amenability to treatment would be dependent on whether he disengaged from MS-13. (Tr. at 51.) Although Dr. Rioja found that the defendant had high amenability to treatment because "he does not suffer from any psychopathy, cognitive impairment or a severe substance use disorder, he has adequate insight into the causes of his problems, takes responsibility for his actions and feels distressed about his current situation, he continues to work on improving family relationships, has positive attachments and is open to change," she also noted the importance of disengagement from the MS-13 in order for the defendant to rehabilitate. (*Id.* at 16.) Although defendant has supportive family members including his mother, sister, and brother, it is unclear whether he will return to his family and disengage from MS-13 upon release or return to MS-13. Further, defendant's estrangement from his family, which he stated drove him to join MS-13, occurred when he dropped out of school, causing him to be kicked out of his home, *see United States v. H.V.T.*, 1997 WL 610767 at *4 ("It appears that H.V.T. had a family structure available to him in his older brothers and aunts and uncles in the United States. Instead of taking advantage of the support that structure offered, H.V.T. quit school and left home. . . . It also appears that H.V.T. became a member of a gang."), and he continued to associate with the gang for quite some time, *see Doe*, 49 F.3d at 867 (finding that district court did not abuse its discretion by concluding that defendant's social background was a factor weighing in favor of transfer due to defendant's "long association" with a violent gang).[6] Although the defendant reported that he was spending more time with his family before his arrest, he was evidently still spending time with MS-13 as he was arrested in the company of other MS-13 members and associates. (Gov't Mem. at 8-9.) Accordingly, merely because he has strengthened relationships with family members since he has been incarcerated does not mean that defendant is likely to rehabilitate and cut ties with MS-13 if released.

In sum, defendant's age of 17 years and 10 months at the time of the crime and

---

[6] In fact, in his psychological evaluation, the defendant noted that he participated in 10-15 fights during his involvement with the gang, including a beating of the innocent owners of a bodega. (Rioja Report at 6-7.)

7

current age of 20 weighs strongly in favor of transfer, and defendant's social background weighs slightly in favor of transfer. Accordingly, the age and social background factor weighs in favor of transfer.[7] *See, e.g., United States v. Juvenile (I.H., Jr.)*, 1 F. Supp. 2d 509, 518 (D.V.I. 1998) ("I.H.'s age at the time of the offenses [16 at time of carjacking and rape; 17 at time of robbery] and at the time of transfer [19] auger in favor of transferring him for prosecution as an adult.").

B. Nature of the Offense Alleged

As an initial matter, as noted *supra*, a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States v. Doe #1*, 74 F. Supp. 2d 310, 317 n.6 (S.D.N.Y. 1999) ("For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment."). There is no question that the offenses charged in the Information are serious and extremely violent. Defendant and his co-conspirators are alleged to have murdered an individual in order to gain entrance into the Sailors clique and maintain or increase their position in MS-13. The murder was premeditated, with the defendant and his co-conspirators luring the victim to the murder site with the intent to kill him. The defendant and his co-conspirators shot the victim with a firearm and used a machete and a knife to stab and slash the victim's throat and also robbed the victim.

The Court finds not only that this factor weighs overwhelmingly in favor of transfer, but also that this factor should be afforded more weight than any of the other factors. *See Nelson I*, 68 F.3d at 590 ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors."). An intentional murder such as the crime alleged here constitutes the type of "particularly serious" crime that warrants weighing the nature of the offense more heavily than any of the other factors in the transfer analysis. Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious – or even, in some cases, less serious – than the crimes alleged here. *See United States v. One Juvenile Male*, 40 F.3d 841, 846 (6th Cir. 1994) (district court did not abuse discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a car's passenger, "outweighed any factors that supported trying the defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it

---

[7] Even assuming *arguendo* that this factor weighed against transfer, the Court would still conclude that transfer is warranted based upon a balancing of the other factors, for the other reasons set forth herein. *See, e.g., United States v. Jerry Paul C.*, 929 F. Supp. 1406, 1408 (D.N.M. 1996) (transferring defendant to adult status where his age of 15 weighed against transfer, but other factors "tilt[ed] in favor of transfer").

8

deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *Doe #1*, 74 F. Supp. 2d at 321 (although majority of factors weighed against transfer, transfer nonetheless was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior"); *In re J. Anthony G.*, 690 F. Supp. at 766 ("While all of the factors weigh very heavily, I feel that the seriousness of this offense is perhaps the most critical factor in this case. While his family seems very supportive of him, [the defendant] has chosen to break away from his family and lead a life that is completely unknown to them. Except for the fortuity of one of the four bullets striking the metal frame of the window, [the defendant] would have been accused not only of attempted robbery, but of murder.").[8]

---

[8] The Court acknowledges that there are juvenile transfer cases in which the defendant allegedly committed murder, but was not transferred to adult status. *See, e.g., United States v. A.F.F.*, 144 F. Supp. 2d 797 (E.D. Mich. 2001); *United States v. Leon D.M.*, 953 F. Supp. 346 (D.N.M. 1996); *United States v. M.L.*, 811 F. Supp. 491 (C.D. Cal. 1992). As an initial matter, the Court notes that each of these cases are factually distinguishable from the defendant's case. For example, the nature of the offense in *A.F.F.* is distinguishable from the offense alleged here – although both *A.F.F.* and the defendant here were charged with murder, the murder alleged in *A.F.F.* had no ties to any organized gang activity and instead was related to a child abuse incident that "was not motivated by personal gain, greed or avarice, but rather resulted from an apparent psychological reaction to circumstances with which the defendant could not cope." *A.F.F.*, 144 F. Supp. 2d at 803. The decision whether to transfer a juvenile to adult status is a fact-specific inquiry that is left to the sound discretion of the district court and is based upon a number of statutory factors and considerations, as discussed herein. Accordingly, the Court finds these cases to be unpersuasive and further finds, for the reasons discussed *supra*, that when the nature of the offense is analyzed and balanced in conjunction with the other statutory factors under the particular circumstances of *this* case, transfer to adult status is clearly warranted.

## C. Nature and Extent of Any Prior Delinquency Record[9]

---

[9] Although the Second Circuit has never addressed the issue, there is a circuit split regarding whether this factor should encompass both arrests and convictions, *see United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998), or whether it should apply only to convictions, *see United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Tenth Circuit has acknowledged the split but has declined to reach the issue, finding instead that even if this factor were limited to prior convictions, a juvenile's additional conduct would be relevant to other factors in the transfer analysis. *See United States v. Anthony Y.*, 172 F.3d 1249, 1253-54 (10th Cir. 1999), *cert. denied* 528 U.S. 897 (1999) ("Even if we limited Anthony Y.'s prior delinquency to the three adjudicated offenses, the additional conduct considered by the district court was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts.' [T]he plain language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise, the juvenile has taken, as long as it is relevant." (additional quotation marks and internal citations omitted)); *cf. A.R.*, 203 F.3d 955, 961 n.2 (citing *Anthony Y.* and noting "[w]e need not resolve this question since the district court did not place greater weight on this factor relative to others"); *Doe #1*, 74 F. Supp. 2d at 315 n.5 (noting split and stating that "the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the 'prior juvenile record' factor" (citation omitted)). *But see In re Sealed Case*, 893 F.2d 363, 369 n.12 (D.C. Cir. 1990) ("But since . . . the purpose of the Act is

Defendant has a limited criminal history before the instant crime occurred. He was arrested on December 26, 2010, when he was sixteen years old, and charged with petit larceny. (Gov't Mem. at 8.) Because of the defendant's age at the time of this arrest, the circumstances and final disposition have been sealed. (*Id.*) Because it does not appear he was convicted, the Court declines to consider this arrest in its determination.

On September 8, 2012, defendant is alleged to have killed Vallejo. On May 14, 2013, approximately eight months after the commission of the Vallejo murder and when defendant was eighteen years old, the defendant was arrested by the Nassau County Police Department ("NCPD") for criminal possession of a weapon in the second degree. (*Id.* at 8.) The defendant was with four men at the time, all of whom were identified as members or associates of the MS-13. (*Id.* at 8-9.) The defendant claimed that he had found the gun in a garbage bag on the day of the arrest and was carrying it in his waistband when stopped by the NCPD. (*Id.* at 9.) However, the FBI's investigation revealed that the weapon was a Sailors clique weapon that had been given to the defendant to use against rival gang members. (*Id.*) On June 6, 2014, the defendant pled guilty to being an alien in illegal possession of a firearm, in violation of 18 U.S.C. § 922(g).

While imprisoned at the Nassau County Correctional Facility, defendant has been disciplined. On April 11, 2014, he was cited for giving/accepting money without authorization and was sanctioned to a ninety day loss of phone privileges. (*Id.* at 10.) On May 10, 2014, the defendant was cited for possessing a dangerous weapon when a shank was found in his jail cell under his mattress; as a result, he was sanctioned to forty days' loss of good time credit, ninety days of disciplinary segregation, and 180 days of lost communication privileges. (*Id.*) Because defendant was not arrested or convicted for this activity, the Court will not consider this in making its decision.

Although defendant does not have any criminal convictions prior to the alleged offense, he was convicted of illegally possessing a firearm, which was linked to his gang activity, after his eighteenth birthday. The Second Circuit has noted that "[w]here a juvenile has committed serious adult offenses shortly after the alleged act of delinquency, a presumption may well arise that it would be a futile gesture to pursue juvenile proceedings." *Nelson I*, 68 F.3d at 590. Accordingly, although defendant's prior criminal history weighs against transfer, his subsequent criminal history weighs in favor of transfer when he was arrested and convicted of carrying a MS-13 clique weapon, several months after the murder and after his 18th birthday.[10]

### D. Juvenile's Present Psychological Maturity and Intellectual Development

Defendant underwent a psychological examination conducted by Dr. Rioja, a clinical and forensic psychologist who prepared an evaluation of the defendant for

---

rehabilitation and not punishment, Congress could not have contemplated the hearing to focus on a plethora of uncharged and unproven offenses."). In any event, this Court need not resolve this question because the Court has considered only the offenses of which the defendant was adjudicated guilty, and not the offenses for which the defendant was arrested. The Court is not considering any conduct that related solely to an arrest.

[10] The fact that the crime defendant was previously convicted of occurred after the murder for which he is charged in this case "does not alter the importance of considering these convictions on the transfer motion." *Nelson I*, 68 F.3d at 590.

10

the defense. Dr. Rioja examined the defendant on June 1, 2015, July 13, 2015, and July 20, 2015, and prepared the report on August 4, 2015. (Rioja Report at 1.) As noted *supra*, Dr. Rioja also testified at the transfer hearing.[11]

During the examination, Dr. Rioja conducted a psychological evaluation and administered several psychological tests, including the Test of Memory Malingering (TOMM), Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV; Spanish Edition); Psychopathy Checklist Screening Version (PCL; SV); Risk-Sophistication-Testing Inventory (RSTI); Historical-Clinical-Risk Management Guide (HCR-20V3). (*Id.*)

Dr. Rioja reported that defendant demonstrated no impairments in reality contact, auditory hallucinations, paranoia, bizarre thoughts, other psychotic symptoms, or delusional beliefs. (*Id.* at 9.)

As to the defendant's intellectual development, no cognitive impairment or significant deficits were noted, and his intellectual functioning is estimated to be in the average range when compared with individuals his age. (*Id.* at 10.) A significant discrepancy was found between his verbal and non-verbal abilities. (*Id.*) On the VCI, "a measure of verbal concept formation, verbal reasoning, and knowledge acquired from one's environment," defendant scored within the low average range; however, on the PRI, "a measure of perceptual and non-verbal reasoning, spatial processing, and visual-motor coordination," defendant fell within the average range, "indicating that he performed better on tasks that required him to reason with nonverbal, visual materials." (*Id.*)

Dr. Rioja also administered the RSTI, which assesses the functioning of juvenile offenders for dangerousness, sophistication-maturity, and treatment amenability. (*Id.*). On the risk of dangerousness scale, defendant obtained an overall score within the low offender range. (*Id.*) He obtained scores within the middle offender range on the violent and aggressive tendencies and planned and extensive criminality scales, which reflect his history of violence and criminality in the context of gang-affiliation. (*Id.*) He obtained a score in the low offender range on the psychopathic features scale, because he did not appear egocentric, manipulative, or deceptive. (*Id.*)

Dr. Rioja found that the defendant scored within the moderate offender range as to developmental maturity, "meaning that his level of developmental maturity was comparable to that of most adolescents in the normative sample." (*Id.* at 11.) However, Dr. Rioja noted that this scale was the most difficult to rate retrospectively and may be an overestimate of his actual level of developmental maturity at the time of the offense. (*Id.*) The defendant obtained a low score in autonomy, which generally is linked to individuals "lack[ing] a good sense of who they are or their future goals." (*Id.*) However, the defendant scored within the moderate range on cognitive capacities and high range on emotional maturity, meaning that he "had some ability to understand the wrongfulness of his actions, some understanding of behavioral norms, and some ability to anticipate the consequences" as well as "some understanding of the negative effects that breaking the law could have on others and some ability to anticipate consequences, to regulate his emotions, and to appropriately relate to others." (*Id.*) Dr.

---

[11] The Court primarily cites to Dr. Rioja's report, rather than her testimony, but notes that her testimony was consistent with her report.

11

Rioja concluded that "[d]espite having a moderate degree of cognitive maturity and no significant deficits in emotional maturity (emotional self-regulation), it appears that Mr. Cruz's lack of autonomy made him dependent on the gang reducing his ability to overcome their pressure." (*Id.*)

Dr. Rioja further concluded that the defendant scored within the high offender range as to treatment amenability, suggesting high amenability to treatment, noting that he "does not suffer from any form of psychopathology, demonstrated a positive expectation of treatment (e.g., to help him stay away from the gang, get an education, and get closer to his family), demonstrated anxiety and stress about his current situation, expressed motivation for rehabilitation interventions and took responsibility for his actions." (*Id.*) Dr. Rioja further noted that the defendant "does not suffer from any mental illness, personality disorder, or cognitive impairment, which can frequently interfere with youth's response to rehabilitation interventions." (*Id.* at 11-12.)

Dr. Rioja also conducted a violence risk assessment due to the possible limitations of using the RSTI retrospectively and concluded that the defendant's "history of violence and criminal behavior is closely linked to his gang affiliation" and because he "does not have any history of violence prior to his gang involvement, does not appear impulsive, does not have problems with emotional regulation and does not present with psychopathic personality traits, his risk for violence would appear low as long as he is disengaged from MS-13. His risk will increase in the context of gang-activity." (*Id.* at 14.) However, as noted *supra*, the Court believes there is an insufficient basis to conclude that the defendant presents a low risk of re-engaging in MS-13 gang activity if he is treated as a juvenile.

Based on this record, the Court finds that this factor weighs in favor of transfer. Defendant's intellectual development is at least average. Although the defendant scored within the low average range as to verbal concept formation, verbal reasoning, and knowledge acquired from one's environment, Dr. Rioja noted that this index "is sensitive to cultural opportunities at home, richness of early environment, and school learning, which may have contributed to his lower performance." (*Id.* at 10.) However, the defendant performed better on tasks requiring him to reason with nonverbal, visual materials and overall, "no cognitive impairment or significant deficits were noted." (*Id.*) Although the defendant obtained a low autonomy score, which Dr. Rioja concluded "made him dependent on the gang reducing his ability to overcome their pressure," she also concluded that the defendant had a "moderate degree of cognitive maturity and no significant defects in emotional maturity." (*Id.* at 11.) Thus, it does not appear that low intelligence, immaturity, or some type of mental or cognitive impairment can adequately explain the defendant's decision to join the MS-13 gang and participate in violent activity, including an alleged brutal murder. Accordingly, the defendant's intellectual development and maturity weigh in favor of transfer.[12] *See generally U.S. v. Juvenile K.J.C.*, 976 F. Supp. 1219, 1229 (N.D. Iowa 1997) ("A number of district courts have noted that more mature and developed juveniles are more likely to be beyond

---

[12] Even assuming *arguendo* that this factor weighed against transfer, the Court still would conclude that transfer is warranted based upon the weight of the other factors favoring transfer, especially the nature of the alleged crime and the defendant's age at the time the crime was committed.

12

redemption and that therefore it is in keeping with the statutory premise . . . to view immaturity and lack of development as factors weighing against transfer to adult status and maturity and development as factors weighing in favor of transfer.") (quotations and citations omitted) (collecting cases).

### E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

There is no evidence that the defendant ever received any prior treatment or counseling. (Gov't Mem. at 20.) Accordingly, this factor is neutral in the transfer analysis. *See Juvenile Male*, 554 F.3d at 469 (finding that responsiveness to past treatment efforts factor neutral where defendant had not been enrolled in any formal treatment program).

### F. Available Programs That Are Designed to Treat the Juvenile's Behavior Problems

The government asserted that, according to the Northeast Regional Office of the Bureau of Prisons, there are no federal facilities for individuals adjudicated as juvenile delinquents. (Gov't Mem. of Law at 21.) Instead, such individuals from this district would be sent to state contract facilities for juveniles in either Pennsylvania or Maine. (*Id.*) No such facilities would be available in New York State for individuals of the defendant's age. (*Id.*) The government further noted that the defendant is already eligible to be incarcerated in an adult facility because he is over 18 years old. (*Id.*)

The Court finds that the government has failed to meet its burden on this factor. As noted by the Second Circuit, the government must "do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is at least some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant. Thus, the Court finds that this factor weighs against transfer, but does not outweigh the other factors which, in combination, overwhelmingly favor transfer. *See Doe #3*, 113 F. Supp. 2d at 609 (finding factor weighed against transfer where "the government did no more than merely assert the unavailability of an appropriate juvenile rehabilitative program for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist") (internal quotation marks, alterations, and citation omitted).

\*   \*   \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that the transfer of defendant to adult status is warranted in the interest of justice. As an initial matter, defendant is charged with a brutal murder in connection with MS-13 gang activity. This serious and violent type of crime strongly weighs in favor of transfer. Moreover, the possibility of rehabilitation is doubtful as Dr. Rioja testified that any possibility of rehabilitation would be dependent on whether the defendant maintained or cut ties with MS-13. Furthermore, the fact that he is already 20 years old, and was over 17 years old at the time of the offense, considered in conjunction with the other factors, also strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be

13

appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior.") (internal quotation marks and citations omitted); *J. Anthony G.*, 690 F. Supp. at 766 ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). The Court finds, therefore, that defendant's rehabilitation potential is low.

The Second Circuit has made clear that "while rehabilitation is a priority, the courts are not required to apply the juvenile justice system to a juvenile's diagnosed intellectual or behavioral problems when it would likely prove to be anything more than a futile gesture." *Nelson I*, 68 F.3d at 590 (internal quotation marks and citation omitted). In addition, "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *Nelson II*, 90 F.3d at 640 (internal quotation marks and citation omitted). Accordingly, given that the crimes charged here involve the "heinous . . . crime of intentional murder," *Nelson I*, 68 F.3d at 590, and given that the record demonstrates that defendant is unlikely to be rehabilitated before he would be released from juvenile custody if convicted, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer defendant to adult status is granted.

IV. CONCLUSION

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.



JOSEPH F. BIANCO
United States District Judge

Dated: October 23, 2015
Central Islip, New York

\*   \*   \*

The United States is represented by Robert Capers, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722 by Raymond A. Tierney John J. Durham, and Paul Scotti, Assistant U.S. Attorneys. Defendant Juvenile Male is represented by Richard W. Levitt, 40 Fulton Street, 23rd Floor, New York, New York 10038.

14